UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DONALD STOCKMYER,

                    Plaintiff,

    v.

DALE FETROE, et al.,

                    Defendants.

No. C16-5614 BHS-TLF

**REPORT AND RECOMMENDATION**
**Noted for: September 8, 2017**

      Defendant Dale Robertson, PA-C, MCHS, moves for dismissal of Plaintiff Donald Stockmyer's claims pursuant to Fed. R. Civ. P. 56. Dkt. 27. Mr. Stockmyer, a state prisoner proceeding *pro se*, claims that PA-C Robertson was deliberately indifferent to his medical needs when Mr. Stockmyer was housed at the Clallam Bay Corrections Center (Clallam Bay CC).[1]

      The undersigned recommends that Defendant Robertson's motion for summary judgment be granted.

### STATEMENT OF FACTS

**A.**     **Plaintiff's Allegations**

      Mr. Stockmyer alleges that his medical providers breached the standard of care and were negligent in denying him a referral to a specialist and medical shoes. Dkt. 28, Williams Decl. ¶ 2, Ex. A (Deposition of Donald Stockmyer, February 24, 2017), 111:16-23; 112:12-23.

---

[1] The remaining defendants have also filed a motion for summary judgment (Dkt. 31), which will be addressed by separate report and recommendation.

REPORT AND RECOMMENDATION - 1

According to Mr. Stockmyer, he had previously been given medical shoes on two occasions for peripheral neuropathy when he was housed at the Stafford Creek Corrections Center ("SCCC"). Dkt. 41, p. 4. He further alleges that he was denied medical care when he experienced pain because the amount of his Naproxen prescription was reduced. Dkt. 5, Complaint at 3-4; Dkt. 28, Williams Decl., ¶ 2.

**B.     Medical Care Provided by PA-C Robertson**

PA-C Robertson has been a physician assistant since 2007 and worked for the Washington State Department of Corrections ("DOC") for approximately six years. Dkt. 29, Robertson Decl., ¶ 2. PA-C Robertson was part of a team of doctors and nurses who provided medical treatment to offenders including urgent care, emergency care, and chronic care in accordance with DOC policy and the Offender Health Plan ("OHP"). *Id.*, Robertson Decl., at ¶ 3. The OHP describes the health care services available to offenders, as well as the services that are limited or not available, and the criteria and process for determining what health services DOC provides. *Id*.

PA-C Robertson's responsibilities included "providing treatment to offenders during sick call and other visits to medical and reviewing and responding to healthcare kites (written requests from offenders to Health Services)." Dkt. 29, Robertson Decl., ¶ 3. He also participated in the medical Care Review Committee Process ("CRC"). The CRC consists of "a panel of DOC primary care physicians, physician assistants, and nurse practitioners, who are appointed by the Chief Medical Officer to review the medical necessity of proposed health care." *Id*.

PA-C Robertson worked at the Clallam Bay CC from 2014 until summer 2015 and provided medical treatment to Mr. Stockmyer during that timeframe. Dkt. 29, Robertson Decl., ¶¶ 2, 4. PA-C Robertson left Clallam Bay CC at the end of the summer in 2015 and did not see

REPORT AND RECOMMENDATION - 2

Mr. Stockmyer after that time. *Id.*; Dkt. 28, Williams Decl., ¶ 2, Ex. A (Stockmyer Dep.), at 110:21-22.

PA-C Robertson provided treatment to Mr. Stockmyer on the following dates: March 7, 2014; August 5, 2014; September 9, 2014; October 7, 2014; and June 1, 2015. Dkt. 29, Robertson Decl., ¶ 4. PA-C Robertson was also part of a CRC in October 2014 that evaluated Mr. Stockmyer's requests for an orthopedic consult and for medical shoes. *Id.*, Robertson Decl., ¶ 9.

Mr. Stockmyer's first visit with PA-C Robertson on March 7, 2014, was a hypertension follow-up visit with chief complaints of back and foot pain. Dkt. 29, Robertson Decl. ¶ 5, Ex. A. Mr. Stockmyer had a history of hypertension but had stopped taking his medications for it. He also complained of back and bilateral foot pain. *Id*. He requested medical shoes if they were available and a lower bunk and lower tier if available. On exam, his feet had no visible deformities and he had intact capillary refill, good range of motion, and good strength. The assessment was hypertension and back and foot pain. *Id*. PA-C Robertson prescribed Atenolol and Lisinopril for the hypertension and ordered weekly blood pressure checks for four weeks to monitor Mr. Stockmyer's blood pressure on the medication. PA-C Robertson discussed with Mr. Stockmyer that there was no medical necessity for medical shoes at that time, but offered to order an x-ray of Mr. Stockmyer's feet to look for deformities or related abnormalities. Mr. Stockmyer declined the x-ray. *Id*. According to Mr. Stockmyer, there was no need to have an x-ray taken as neuropathy does not show up on an x-ray. Dkt. 41, p. 4.

On March 6, 2014, Mr. Stockmyer submitted a health service kite, stating: "I need new medical diabetic shoes . . . diabetic shoes secondary to peripheral neuropathy and spinal cord damage." Dkt. 23, p. 27. Medical Director Clifford Johnson, D.O., responded to the kite on

REPORT AND RECOMMENDATION - 3

March 11, 2014, stating: "D.O.C. policy has changed since you were allowed Propet shoes. If your D.O.C. shoes do not fit properly, see property for fitting. See copy of most recent revised information (updated on Sept. 3, 2013)." *Id.* A copy of the DOC policy, which was attached to the kite, provided: "reasonable quality footwear including Longitudinal Foot Orthotics (LFOs) may be issued to diabetic patients with documented severe peripheral neuropathy (neuropathic sensory deficit that clearly is the redisposing factor in foot ulcers, fractures, distal joint destruction) OR arterial insufficiency." Dkt. 23 at 28. Mr. Stockmyer is not diabetic. Dkt. 28, Williams Decl., ¶ 2, Ex. A (Stockmyer Dep.), at 55:24-25, 56:8.

PA-C Robertson treated Mr. Stockmyer again on August 5, 2014. At that time, Mr. Stockmyer complained of bilateral foot pain, requested the results of his left hip x-rays, asked for a shingles vaccination, and had questions about whether his blood pressure was being controlled with the new medication and the charges he was incurring for medical treatment. Dkt. 29, Robertson Decl., ¶ 6, Ex. B at 1. PA-C Robertson told Mr. Stockmyer that his blood pressure had significantly improved on the new medication and to continue taking it as prescribed. He also discussed Mr. Stockmyer's left hip arthritis and advised him to continue taking his Naproxen as ordered. *Id.* They discussed his request for a shingles vaccine with the infection control nurse and agreed to await a conversation with the medical director regarding that request. *Id.* The infection control nurse also discussed Mr. Stockmyer's billing concerns with him. *Id.*

During this visit, Mr. Stockmyer again requested a new pair of medical shoes to replace the pair he had received four years earlier. *Id.* PA-C Robertson discussed Mr. Stockmyer's bilateral foot pain and neuropathy with him and informed him that it was DOC policy to only issue foot comfort devices for diabetic neuropathy, which Mr. Stockmyer did not have. *Id.* Examination of Mr. Stockmyer's feet was within normal limits. *Id.* PA-C Robertson completed

REPORT AND RECOMMENDATION - 4

a diagnostic imaging request for x-rays of Mr. Stockmyer's feet to evaluate his foot discomfort, but on August 12, 2014, Mr. Stockmyer refused the x-rays. Dkt. 29, Robertson Decl. ¶ 6, Ex. B at 2.

Mr. Stockmyer was seen by PA-C Robertson again at sick call on September 9, 2014, to update his Physician Orders for Life-Sustaining Treatment (POLST) form to allow for a natural death with DNR and no artificial life sustaining measures. Dkt. 29, Robertson Decl. ¶ 7, Ex. C. Mr. Stockmyer denied he had any additional concerns at that time. *Id*. His blood pressure was 156/104, and a second measure was 160/102, as compared with a blood pressure of 130/88 on August 27, 2014. *Id*. PA-C Robertson's assessment was hypertension and ordered increased blood pressure and blood pressure checks for every week for four weeks to monitor the hypertension. *Id*. Mr. Stockmyer was advised to return to medical if any concerns arose. *Id*.

PA-C Robertson saw Mr. Stockmyer again at sick call on October 7, 2014, for a chief complaint of chronic low back pain. Dkt. 29, Robertson Decl. ¶ 8, Ex. D. Mr. Stockmyer had a history of chronic low back pain with a laminectomy in 1967, lumbar degenerative joint disease, L5 fusion, AC joint degenerative joint disease, and a right thoracic rib deformity. *Id.* He had been taking Naproxen to help relieve the pain but it only helped for a little while and he wanted to see a back specialist about possibly having surgery to correct his old rib fracture. *Id*. Mr. Stockmyer reported that he was performing back exercises as instructed and was losing weight, but he still had pain and wanted to see a specialist. *Id*.

On exam, Mr. Stockmyer had right-sided, mid-thoracic paraspinal tenderness and tenderness to palpation in the lower rib area. Dkt. 29, Robertson Decl. ¶ 8, Ex. D. He had intact tandem walk, good tiptoe walk, good heel walk, and bilateral negative straight leg raises. *Id*. PA-C Robertson ordered x-rays of the thoracic spine, lumbar spine, and chest that day and

REPORT AND RECOMMENDATION - 5

advised Mr. Stockmyer that he would present his request to see a specialist to the CRC once the x-ray results were received. *Id*. In the meantime, PA-C Robertson advised Mr. Stockmyer to continue taking his Naproxen and Tylenol over the counter as indicated for pain, continue with the back strengthening and stretching exercises and his efforts to lose weight, and to return to medical if any concerns arise. *Id*.

**C.    CRC - Requests for Specialist and Medical Shoes**

Mr. Stockmyer's requests for an orthopedic consult and for medical shoes were submitted for CRC review. Dkt. 29, Robertson Decl., ¶ 9, Ex. E at 1; ¶ 10, Ex. F at 1. The CRC report noted his history of chronic back pain and that his exam was unremarkable and there were "[n]o clinical findings to support intervention." *Id.*, Robertson Decl., ¶ 9, Ex. E at 4; ¶ 10, Ex. F at 3. The x-ray report was read to the panel in full. Mr. Stockmyer had no x-ray findings, no acute physical findings, and no neurogenic claudication was noted. *Id*. He could heel toe walk and tandem walk, his range of motion was good, he walked upright, he was able to retrieve a dropped coat without difficulty, and was able to perform all of his activities of daily living. *Id*. Examination of his feet was also totally normal with good range of motion, intact sensation, good capillary refill, and no history of diabetes though Mr. Stockmyer stated he had neuropathy. *Id*. The CRC concluded that Mr. Stockmyer did not meet the DOC criteria for medical shoes. The CRC discussed the proposed intervention and determined that the orthopedic consult and medical shoes were not medically necessary at that time. *Id.*, Robertson Decl. ¶ 9, Ex. E at 3-4; ¶ 10, Ex. F at 2-3.

PA-C Robertson saw Mr. Stockmyer again on June 1, 2015, for renewal of his hypertension medication. Dkt. 29, Robertson Decl. ¶ 11, Ex. G. His prescriptions for Lisinopril, Atenolol, and Amlodipine were renewed. *Id*. His blood pressure was 144/78 and no other

REPORT AND RECOMMENDATION - 6

complaints were noted. *Id*. Eventually, Mr. Stockmyer bought himself a pair of tennis shoes that he felt were not as comfortable as the medical shoes, but were better than the state-issued shoes. Dkt. 28, Williams Decl. ¶ 2, Ex. A (Stockmyer Dep.), at 54:1-14.

Mr. Stockmyer's prescription for Naproxen was tapered back to 500 mg daily after a change in DOC policy regarding prescriptions for over the counter analgesic medicines. Dkt. 29, Robertson Decl. ¶ 12; Dkt. 23 at 17. "As outlined in the Offender Health Plan, offenders will be responsible for the purchase of medication that can be obtained from the offender store. If an offender lacks sufficient funds, a debt can be created." Dkt. 23 at 17. In accordance with the OHP, treatment providers were instructed not to write long term prescriptions for Naproxen and other over the counter medication without first acquiring the Medical Director's authorization. Dkt. 29, Robertson Decl. ¶ 12; Dkt. 23 at 17. The Medical Director authorized a prescription of 500 mg per day for Mr. Stockmyer and Mr. Stockmyer was told he could purchase additional Naproxen from the offender store. *Id*. Mr. Stockmyer had been advised previously that 500 mg daily was the maximum recommended daily dose and his request to increase the dose was deemed "not medically necessary in accordance with the Offender Paid Healthcare." Dkt. 23 at 12.

Mr. Stockmyer understood that the Naproxen prescription was reduced due to a change in DOC policy. Dkt. 28, Williams Decl. ¶ 2, Ex. A (Stockmyer Dep.), at 65:13-17. He "realize[d] that they're restricted, the doctors in the institution are restricted in what they can give you and stuff by DOC policy" and he knew "it's not all on them." *Id.*, Ex. A (Stockmyer Dep.), at 49:25-50:3.) Mr. Stockmyer never ran out of Naproxen while he was at Clallam Bay CC, "As a matter of fact, I don't think I ran out of what I had at the time." Dkt. 28, Williams Decl. ¶ 2, Ex. A (Stockmyer Dep.), at 62:25-63:1. At some point, he purchased one bottle from the store and he

REPORT AND RECOMMENDATION - 7

had more bottles that he traded someone else for at least three times. *Id.*, (Stockmyer Dep.), at 63:19-64:3. The only time he was out of Naproxen was when he was transferred from Clallam Bay CC. *Id.*, (Robertson Dep.), at 107:9-10; *see also* Dkt. 41, p. 4 (from "1/27/16 until 2/15/17 or thereabouts"). However, this is not during the timeframe that PA-C Robertson was involved with his care.

There was never a time while he was at Clallam Bay CC that he was not taking Naproxen *(id.*, (Stockmyer Dep.), at 64:14-17) and he had the option to go to the offender store and purchase additional Naproxen as needed (*id.*, (Stockmyer Dep.)*,* at 107:15-19). During the time he was at Clallam Bay CC, Mr. Stockmyer estimates he went through one bottle of Naproxen. *Id.*, Ex. A (Stockmyer Dep.), at 64:19-23. According to Mr. Stockmyer, his time at Clallam Bay CC "was some of the least problems [he] had with [his] back." *Id.*, Ex. A (Stockmyer Dep.), at 91:8-10.

## SUMMARY JUDGMENT STANDARD

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of production to demonstrate the absence of any genuine issue of material fact. *Id.*; *see Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000). A nonmoving party's failure to comply with local rules in opposing a motion for summary judgment does not relieve the moving party of its affirmative

REPORT AND RECOMMENDATION - 8

duty to demonstrate entitlement to judgment as a matter of law. *Martinez v. Stanford*, 323 F.3d 1178, 1182-83 (9th Cir. 2003).

"If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). The non-moving party may not rely upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). A plaintiff must "produce at least some significant probative evidence tending to support" the allegations in the complaint. *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990).

## DISCUSSION

### A.  Eighth Amendment Medical Care

#### 1. Qualified Immunity

Defendant argues that he is entitled to qualified immunity. Under the doctrine of qualified immunity, prison officials are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity has objective and subjective components. *Id.* at 815. Under the objective component, the defendant is entitled to qualified immunity if the act or omission was objectively reasonable, in light of legal rules that were clearly established at the time of the act or omission. *Anderson v. Creighton,* 483 U.S. 635, 639 (1987). Under the subjective component, qualified immunity does not protect a state official if that person knew or reasonably should have known that the act or omission (within the scope of his or her scope of official responsibility) would

REPORT AND RECOMMENDATION - 9

violate the plaintiff's constitutional rights, or if he or she acted, or failed to act, with malicious intent to cause a deprivation of the plaintiff's constitutional rights or other injury. *Harlow,* 457 U.S. at 815.

A civil rights plaintiff opposing a claim of qualified immunity must establish the existence of a constitutional violation, must point to clearly established law that supports the claim, and must show that no reasonable official could believe their conduct was lawful. *Pearson v. Callahan*, 555 U.S. 223, 243-44 (2009). Whether specific acts or omissions deprived the plaintiff of federal constitutional rights under clearly established law must be sufficiently clear that "every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes,* __ U.S. __, 135 S.Ct. 2042, 2044 (2015) (per curiam). The plaintiff must show that existing precedent is sufficiently on point factually with the instant case, to place the constitutional question "beyond debate." *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011). State officials are shielded by qualified immunity if no appellate court precedent squarely governs the facts presented by the plaintiff in the current situation. *Hamby v. Hammond,* 821 F.3d 1085, 1091 (9th Cir. 2016). The court should refuse to apply qualified immunity only if someone "plainly incompetent" or who "knowingly violates the law" would have acted, or failed to act, in the manner that occurred in the instant case. *Id.* at 1092, 1094.

The court concludes that Mr. Stockmyer has failed to show any clearly established law defining a constitutional right of which a reasonable person would have known under the circumstances presented here, and therefore the defendant is entitled to qualified immunity. To be entitled to relief under 42 U.S.C. § 1983, a plaintiff must show: (i) the conduct complained of was committed by a person acting under color of state law; and (ii) the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the United States.

REPORT AND RECOMMENDATION - 10

*Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986).

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). The two prong test for deliberate indifference requires the plaintiff to show (1) "'a serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." *Jett*, 439 F.3d at 1096 (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992)). Deliberate indifference is shown by "a purposeful act or failure to respond to a prisoner's pain or possible medical need, and harm caused by the indifference." *Jett*, 439 F.3d at 1096 (citing *McGuckin*, 974 F.2d at 1060). To state a claim for violation of the Eighth Amendment, a plaintiff must allege sufficient facts to support a claim that the named defendants "[knew] of and disregard[ed] an excessive risk to [plaintiff's] health." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

The medical need must be serious in the constitutional sense, and the indifference to medical needs must be substantial. For example, some indications of a serious medical need that falls within the Eighth Amendment protection would be: if a plaintiff shows the existence of an injury that a reasonable doctor or patient would find to be important and worthy of comment or treatment; a medical condition that would significantly affect an individual's daily activities; and a condition that creates chronic and substantial pain. *Colwell v. Bannister,* 763 F.3d 1060, 1066-1067 (9th Cir. 2014). Allegations that amount to indifference, negligence, or medical malpractice will not support an Eighth Amendment cause of action under Section 1983. *Broughton v. Cutter*

REPORT AND RECOMMENDATION - 11

*Laboratories*, 622 F.2d 458, 460 (9th Cir. 1980) (citing *Estelle*, 429 U.S. at 105–06). "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106; *see also McGuckin*, 974 F.2d at 1059. Even gross negligence is insufficient to establish deliberate indifference to serious medical needs. *See Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990).

Also, "[a] difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981). To prevail, a plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances ... and ... that they chose this course in conscious disregard of an excessive risk to plaintiff's health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1986). A prisoner's mere disagreement with diagnosis or treatment does not support a claim of deliberate indifference. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

Mr. Stockmyer's claims are based on PA-C Robertson's involvement in the CRC decision to deny his request for an orthopedic specialist referral and for medical shoes, and for the reduction in his Naproxen prescription. Dkt. 28, Williams Decl., ¶ 2, Ex. A (Stockmyer Dep.), at 101:7-17, 105:20-21, 112:8-17.

PA Robertson saw Mr. Stockmyer on five occasions over a fifteen month period. During those visits, PA-C Robertson evaluated Mr. Stockmyer's complaints, provided treatment, and prescribed medication. There is no evidence that the treatment provided by PA-C Robertson was inappropriate in light of Mr. Stockmyer's medical conditions or that the treatment did not meet the medical standard of care. Further, there is no evidence of an excessive risk to Mr. Stockmyer's health resulting from the lack of medical shoes or the amount of Naproxen

REPORT AND RECOMMENDATION - 12

prescribed. There is also no evidence that the CRC decision not to refer Mr. Stockmyer to a specialist was medically inappropriate under the circumstances.

Mr. Stockmyer is clearly dissatisfied with the medical treatment he received and is of the opinion that he should have received medical shoes to alleviate his neuropathy, double doses of Naproxen (without having to purchase any from the inmate store), and a referral to a specialist to evaluate his rib and back pain. However, without evidence that the failure to provide any or all of the foregoing was medically inappropriate, this amounts to no more than a difference of opinion concerning what medical care was appropriate. This is not evidence of deliberate indifference.

Because Mr. Stockmyer has not shown that the course of treatment PA-C Robertson chose was medically unacceptable under the circumstances or in conscious disregard of an excessive risk to Mr. Stockmyer's health, the undersigned recommends that Defendant Robertson's motion for summary judgment on Mr. Stockmyer's Eighth Amendment claim be granted.

**B.     Medical Negligence**

To sustain a claim for medical negligence, a plaintiff must prove that the defendant health care provider failed to exercise the degree of care, skill, and learning expected of a reasonably prudent health or dental care provider acting in the same or similar circumstances, and that "such failure was a proximate cause of the injury complained of." RCW 7.70.040(1)(2). Expert medical testimony is required to establish both the standard of care and to prove causation in a medical negligence action. *Guile v. Ballard Community Hosp.*, 70 Wash. App. 18, 25, 851 P.2d 689 (1993). Mr. Stockmyer has failed to provide competent medical evidence sufficient to support a claim for medical negligence. His belief that he is entitled to different treatment is

REPORT AND RECOMMENDATION - 13

insufficient proof of medical negligence. In addition, and to the extent Mr. Stockmyer is asserting a state law claim, the undersigned recommends that the Court should decline to exercise supplemental jurisdiction and dismiss such state law claims under 28 U.S.C. § 1367(c)(3) when it dismisses Mr. Stockmyer's federal law claims.

Accordingly, the undersigned recommends that PA-C Robertson's motion for summary judgment on the medical negligence claim be granted.

## CONCLUSION

Viewing the record in the light most favorable to Mr. Stockmyer, the undersigned concludes that Mr. Stockmyer has failed to demonstrate the existence of a material issue of fact relating to his claims that Defendant Dale Robertson violated his constitutional rights. Accordingly, it is recommended that Defendant Robertson's motion for summary judgment (Dkt. 61) be **GRANTED** and that all of plaintiff's claims against Dale Robertson be **dismissed with prejudice**.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. Rule 72(b), the parties shall have **fourteen (14) days** from service of this Report and Recommendation to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the Clerk is directed to set the matter for consideration on **September 8, 2017,** as noted in the caption.

**DATED** this 24th day of August, 2017.

*Theresa L. Fricke*

Therese L. Fricke
United States Magistrate Judge

REPORT AND RECOMMENDATION - 14